**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Walter BERRY, Jr., Defendant–Appellant.**

**No. 97–1756.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1997.

Decided Jan. 14, 1998.

Suzanne M. Wissmann (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Paul G. Christenson (argued), Murphysboro, IL, for Defendant–Appellant.

Before EASTERBROOK, DIANE P. WOOD, and EVANS, Circuit Judges.

EVANS, Circuit Judge.

So far, in two appeals to us in this case, Walter Berry, Jr. is batting a slick .500. Today, his average slips to .333.

Berry was indicted in 1994 on two counts of distributing crack cocaine in early September of 1993. A jury decided he was guilty on one of the counts and not guilty on the other. After the verdict was returned it was discovered that the trial was futzed up because copies of the government's transcription of a tape-recorded conversation involving Berry and an informant inadvertently slipped into the jury room during deliberations. This faux pas caused the trial judge, Chief Judge Phil Gilbert of the Southern District of Illinois, to grant Berry's motion for a new trial.

The government appealed the order granting Berry a new trial. We denied Berry's

request to affirm the order and remanded the case to the district court to determine whether the presence of the transcript in the jury room was actually prejudicial to his rights. *See United States v. Berry*, 64 F.3d 305 (7th Cir.1995). On remand, Chief Judge Gilbert determined that Berry was prejudiced and that a new trial was required. The government again appealed the new trial order, and this time Berry won. *See United States v. Berry*, 92 F.3d 597 (7th Cir.1996).

Upon remand, Chief Judge Gilbert transferred the case to Judge William Beatty for the retrial. Before things could get underway, however, a grand jury returned a 3–count superseding indictment that expanded the scope of the charges to include a conspiracy to possess and distribute crack cocaine running from March of 1992 to June of 1994. The old distribution count upon which Berry was convicted in the first trial remained in the new indictment along with an additional distribution charge directly related to it. The second jury found Berry guilty on the conspiracy count but not guilty on the two distribution charges. Berry is now here for the third time.

The charges against Berry grew out of a crack cocaine dealing investigation centered around the Elm Street Housing Project in downstate Carbondale, Illinois. As usually happens in drug cases growing out of investigations of this sort, former pals and associates of a defendant end up being the government's chief witnesses, and such was the case here, particularly with a fellow named Ryan Vinson. Vinson's testimony, which the jury was free to believe, drove a batch of nails into Berry's coffin.

Vinson grew up in the Elm Street Project and hung out with Berry's younger brothers. When Vinson was 16 (in 1991) he started buying crack from Berry, who was 7 years older. Berry, who was born in Hayti,[1] Missouri, sold crack (usually as $20 rocks but sometimes the sales involved $100–$150 "sixteenths") to Vinson more than 30 times, and eventually, Vinson said, he often "stood security" and made drug runs for Berry after

helping to "weigh and bag" the dope. In addition to Vinson the jury heard from others—Eddie Lee Brown, Clinton Wooley (Vinson's uncle), and Tishunda Rowe—who essentially confirmed that Berry was a crack dealer.

Berry's first attack on appeal goes to the sufficiency of the evidence. He says no conspiracy was proven, only a "buyer-seller" relationship between him and others, including Vinson. This view of the evidence, however, is based on a flawed interpretation of several of our cases, including *United States v. Mims*, 92 F.3d 461 (7th Cir.1996), and *United States v. Lechuga*, 994 F.2d 346 (7th Cir.1993) (*en banc*).

In *Lechuga* a government undercover agent tried to buy cocaine from a fellow named Pinto. To get the cocaine, Pinto turned to Pagan, who contacted Lechuga. Lechuga arranged to sell the drugs to Pagan in an apartment building; Pinto and the government agent attended the sale. Lechuga was ultimately convicted of, among other things, conspiring with Pinto and others (presumably Pagan) to distribute the cocaine. On appeal Lechuga argued that the only evidence that he conspired with Pinto was that he sold him a quantity of drugs that was greater than what Pinto would need for his personal use. That evidence, Lechuga contended, was insufficient to prove that he and Pinto actually conspired to commit a crime—there was no evidence, he argued, that he and Pinto agreed to commit any crime beyond the sale. Although we affirmed Lechuga's conviction, we agreed with the premise of this argument, holding "What is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself." 994 F.2d at 347. We reasoned:

When the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for it has no separate criminal object. What is required for conspiracy in such a case is an agreement to commit

---

1. For a small town in the boot heel of Missouri (population 3,280 according to the 1996 Rand McNally Road Atlas, which boasts on its cover

that it has been "trusted for 72 years"), Hayti may be a hotbed for crack dealers. *See United States v. Lewis*, 117 F.3d 980, 982 (7th Cir.1997).

some other crime beyond the crime constituted by the agreement itself.

*Id.* at 349. In other words, in *Lechuga* we held that "a sale agreement cannot constitute a conspiracy when the sale itself is the conspiracy's substantive crime." *United States v. Garcia*, 89 F.3d 362, 365 (7th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 443, 136 L.Ed.2d 340 (1996). But Lechuga had clearly agreed with Pagan, who assisted him in passing the cocaine to another dealer (Pinto) farther down the distribution chain, and this, we noted, was sufficient to sustain his conspiracy conviction.

In *Garcia* the defendant misread *Lechuga*. Garcia, convicted of conspiracy, claimed that only a buyer-seller arrangement was established by the evidence. Garcia argued that a man named Betancourt was the "seller," McAfee was the "buyer," and that he was only the broker between the two. Garcia maintained that because he only bought drugs from Betancourt to sell to McAfee his collaboration with McAfee could not constitute a conspiracy. We disagreed, stating, "On the facts of this case, *Lechuga* stands only for the proposition that Garcia's attempted purchase from Betancourt in and of itself cannot constitute a conspiracy between Betancourt and Garcia." *Garcia*, 89 F.3d at 365.

In *Mims* the defendants' conspiracy convictions were reversed because an erroneous buyer-seller instruction made it possible for the jury to convict two defendants merely upon a showing that one bought cocaine from the other with knowledge that the other was in the drug business. The jury was not required to find an agreement between the two beyond the purchases. At trial the government witnesses testified that Cleveland McDade was a crack cocaine dealer and that Mims was his "man on the street," making as many as ten trips per night between "Crack Alley"[2] and McDade's hotel room. One witness testified that McDade referred to Mims as his "worker." Mims, on the other hand, testified that he was an addict who merely purchased from McDade on occasion but that he had no agreement with him. Although *Mims'* convictions were reversed, we noted that "the evidence was more than adequate to support a conviction for conspiracy." We reversed only because flawed jury instructions failed to focus the jury's attention on the concept of an "agreement," which is necessary to support a conspiracy conviction.

■ Evidence of a conspiracy, as opposed to a buyer-seller relationship, may include transactions involving large quantities of drugs, prolonged cooperation between the parties, standardized dealings, and sales on a credit. *United States v. Sax*, 39 F.3d 1380, 1385–86 (7th Cir.1994). "A prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture is sufficient to sustain a finding of conspiracy." *United States v. Hall*, 109 F.3d 1227, 1232 (7th Cir. 1997).

Here, buying and selling of crack occurred between Berry and Vinson, but that was not all that occurred. Vinson provided security services, made runs, and packaged Berry's crack. If the evidence in *Mims* was sufficient to support a conspiracy, the evidence against Berry is sufficient as well. And Berry, we note, unlike Edward Mims, received the benefit of a buyer-seller instruction which was, on this evidence, a windfall to which he was probably not entitled. *See United States v. Turner*, 93 F.3d 276, 286 (7th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 596, 136 L.Ed.2d 524 (1996) (defendant not entitled to buyer-seller instruction when his coconspirator was more than a mere purchaser and had affirmatively supported the illegal activity that was the object of the conspiracy by accepting shipments for defendant).

■ We shall not tarry in rejecting Berry's other two arguments in support of his claim that the verdict of the jury should be set aside. First, he argues that Judge Beatty erred in acceding to the jury's request that the testimony of one of the witnesses, Officer Tweedy, be read back to them during deliberations. Tweedy had been part of a

---

**2.** Carbondale, Illinois, like Hayti, Missouri, may also be a drug hotbed. The "Crack Alley" referred to in *Mims* was in Carbondale. Carbondale was where our Mr. Berry did business, and it was also the site of the cocaine dealing in the *Lewis* case cited in our other footnote.

surveillance team that watched Berry deliver crack to Brown, and he also took a statement from Berry after his arrest. Whether or not to permit the rereading of testimony after a jury has begun deliberations is a matter uniquely committed to the discretion of the trial court. Having reviewed the record, we cannot see how Judge Beatty could be viewed as having abused his discretion on this point.

■ Finally, in an argument that takes up less than a full page of big print in his brief, Berry says it was reversible error to permit the government's case agent, Jenny Wernsing, to testify at the end of the trial after she sat at the prosecutor's table during the presentation of other evidence. Berry acknowledges that he "understands that current federal practice permits a case agent to testify against the defendant after hearing the testimony," but he says this practice is "objectionable, and should be changed." We fail to see how the practice, permitted under Rule 615 of the Federal Rules of Evidence, is objectionable. *See United States v. Crabtree,* 979 F.2d 1261 (7th Cir.1992). Furthermore, in this case, it is difficult to see how Berry can possibly claim error as Wernsing's wrap-up testimony drew nary an objection from the defense table.

■ With the challenges to the conviction out of the way we turn to Berry's final claim, that Judge Beatty incorrectly pegged his relevant conduct as more than 500 (and less than 1,500) grams of crack. Relevant conduct determinations under the sentencing guidelines are deferentially reviewed for clear error. *United States v. Carmack,* 100 F.3d 1271 (7th Cir.1996).

The presentence report concluded that Berry was responsible for 649 grams of crack. Of those grams, 646 came through a chap named Tyrone Ashford, whom Agent Wernsing interviewed at the Menard Correctional Institution. Ashford reportedly told Wernsing that Berry sold crack to him on a daily basis for approximately one year. Ashford said that he regularly purchased "sixteenths" at between $100 and $150 a pop. Spread over 365 days, by an arithmetic computation, Ashford's purchases totaled 646 grams.

Although Berry argued that Ashford's statements to Wernsing were not reliable, he did not request an opportunity (or an adjournment of the proceeding to explore the opportunity) to put Ashford on the witness stand. Wernsing, on the other hand, indicated her belief, based on her deep understanding of activities of several other drug dealers in Carbondale, that Ashford's statements to her were reliable.

Although we are not altogether comfortable with a proceeding that attributes almost the entire amount of cocaine in a presentence report to the words of a prisoner who does not testify under oath in a courtroom, our discomfort is ameliorated by the fact that Berry, if he truly wanted to challenge the accuracy of the statements, could have easily insisted that Ashford be personally presented.

It's also worth noting that Agent Wernsing testified that she interviewed Vinson in June of 1993 and that he gave a statement which indicated that Berry was a substantial crack dealer. In his statement, Vinson said he purchased cocaine on approximately 200 occasions from Berry, and given the breakdown on various quantities—ranging from $20 rocks to several bigger quantities—Vinson's statement laid more than 1,400 grams of crack on Berry. The June 1993 statement to the agent, admittedly more detailed than the testimony at trial—Vinson testified he purchased crack from Berry "several times" and later he said it was "more than 30" times—was also available to the judge, and it alone was more than sufficient to bring Berry over the 500 gram minimum.

■ District judges, determining drug quantities for purposes of relevant conduct under the federal sentencing guidelines, are not required to act like agents of the Bureau of Weights and Measures. Precision is not required, as it is virtually impossible to attain in the murky world of drug transactions. What is required is simply reasonable assumptions based on reasonably accurate information. That's what we have here. We do not find that it was clearly erroneous for Judge Beatty to find more than 500 grams, considering particularly the 1983 statement

of Vinson and the fact that the defense did not seek to produce Ashford and frontally challenge the information he gave to the agent.

For these reasons the judgment of the district court is

AFFIRMED.