In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-2828, 00-2865

United States of America,

Plaintiff-Appellee,

v.

Francisco Felix-Felix and
Guadalupe Felix-Felix,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 219--Ann Claire Williams, Judge,
and Joan B. Gottschall, Judge.

Argued March 29, 2001--Decided December 27, 2001


   Before Easterbrook, Rovner, and Diane P.
Wood, Circuit Judges.

   Diane P. Wood, Circuit Judge.  Francisco
Felix-Felix and Guadalupe Felix-Felix
were cousins with too much in common.
Both were caught with substantial amounts
of cocaine, and both pleaded guilty to
possession of cocaine with intent to
distribute. Each plea agreement reserved
the defendant's right to appeal the
district court's denial of his motion to
suppress statements made to the police
during questioning, as well as the actual
cocaine the police found. Because we
believe that these statements and
searches were consistent with Fourth
Amendment standards, we affirm the
district court's denial of the
suppression motions. We also find no
error in the sentencing of Francisco
Felix-Felix, and we therefore affirm both
judgments.

I

   In September 1997, DEA agents conducting
surveillance of a known center for drug
transactions in Cicero, Illinois,
observed Guadalupe and Francisco making
calls from pay phones and conducting
brief meetings with other individuals in
and around that area. At one point, the
agents followed the two Felix-Felixes to

an apartment in Cicero, where the officers asked for and received consent from Guadalupe and Francisco to search the premises. Two handguns and $6,100 in cash, which the agents seized, turned up as a result of the search. They made no arrests at the time, and the September 1997 event is not at issue in this case.

Several weeks later, agents observed Guadalupe and Francisco at a currency exchange and followed them to a house at 211 Vintage Road in Buffalo Grove, Illinois. A few months later, on April 1, 1998, they followed their lead on the house and interviewed some of the neighbors. Their interlocutors confirmed that Guadalupe and Francisco frequented the Buffalo Grove residence. The neighbors also mentioned that they rarely saw Guadalupe and Francisco outside the home, but they often saw them driving in and out of the garage in a white Jeep.

At about 1:45 p.m. the next day, DEA agents conducting surveillance of the Buffalo Grove residence saw Guadalupe leave the garage driving a rented maroon van. The agents also saw a parked white Jeep Wrangler inside the garage. Agents followed the maroon van to a McDonald's fast food restaurant in Hickory Hills, Illinois. While they watched, Guadalupe exited the van, went inside to have a meal, walked to a nearby pay phone, and placed several calls. He waited by the telephone until a man, later identified as Eduardo Vargas, approached and looked inside the van. Vargas spotted Guadalupe, walked to the pay phone, and shook hands with him. Vargas then climbed into the van alone, and drove it about a mile away, as agents followed. Without making any stops, Vargas returned to the McDonald's parking lot and placed a telephone call from the same pay phone.

In the meantime, DEA agents had continued surveillance of Guadalupe, who had left the McDonald's and walked to a nearby Walgreen's drug store. After Vargas used the pay phone, Guadalupe left the drug store and met Vargas at the McDonald's. The two then left the McDonald's together and hurriedly walked to the rear of the building. As they walked away from the McDonald's, Guadalupe bent down and placed the van keys on the ground.

After a glance through the van windows revealed a black suitcase and a box for a measuring scale, the agents approached the two men, who by this time had walked into a residential neighborhood south of the shopping center, and asked them if the van belonged to one of them. Initially, they both denied ownership, but after further questioning, Guadalupe admitted that he had been driving the van earlier that day. Agents then brought Guadalupe and Vargas back to the McDonald's restaurant. Guadalupe took the agents to the parking lot area where he had placed the keys to the van on the ground, and he gave the keys to the agents. At some point, either before or after returning to the parking lot, Guadalupe gave the agents written consent, in Spanish, to search the van.

The police conducted their search with the help of a drug-sniffing dog. As soon as the dog jumped into the back of the van, he provided a positive alert for the presence of drugs in the box and the suitcase. He was right: a search of the box and the suitcase revealed 50 kilograms of cocaine (confirmed by a field test). The agents then informed Guadalupe and Vargas of their Miranda rights and formally arrested them.

After Guadalupe's arrest, DEA agents returned to the house in Buffalo Grove and recommenced their surveillance while they waited for a search warrant. At approximately 9:15 p.m., agents observed Francisco pull into the subdivision driving a white Jeep like the one the agents observed earlier in the garage. When Francisco turned into his cul-de-sac and saw the agents' cars, he sped past the agents and did not stop at the house. They pursued him until he was forced to stop at a dead-end street. The agents approached Francisco and asked him, in Spanish, why he was driving in the area and why he did not pull into the garage of the house. He gave some evasive answers, but before too long he signed a written consent form permitting the agents to search the house and garage; he also gave them the garage door opener and the keys to the house.

Two agents stayed outside with Francisco while the search was conducted. Soon after the search began, an agent came back out and reported that he had found

syringes and pharmaceuticals. Asked about these items, Francisco denied ownership. The agents then discovered a suitcase in the foyer closet containing 50 kilograms of cocaine. At this time, the agents advised Francisco of his rights (in Spanish) and arrested him. He requested counsel, at which point all questioning ceased.

II

On April 22, 1998, Guadalupe, Francisco, and Vargas were all indicted on one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. sec. 846, and two counts of possession of cocaine with intent to dis tribute, in violation of 21 U.S.C. sec. 841(a)(1). Vargas entered into a plea agreement with the government. In his guilty plea, Vargas admitted that he had met with both defendants to negotiate several drug sales. He stated that on the day before the arrest, he met Guadalupe at the same McDonald's restaurant and, using the same rental van, received two suitcases containing cocaine. Vargas told agents that they had planned to make another buy on April 2, but Vargas had noticed that he was being trailed by law enforcement agents, which was why Guadalupe and Vargas walked away from the van.

Prior to trial, Francisco moved to suppress the statements he made when his Jeep was stopped and to suppress the evidence obtained in the search of the Buffalo Grove house. The stop of his Jeep, he asserted, was an arrest for which probable cause was required; before the officers could speak with him, he argued further, they should have given him his Miranda rights. The lack of both safeguards meant that all of his answers to the agents' questions, the consent to search form, and the results of the search of the residence were illegal evidence subject to suppression.

Guadalupe also filed a motion to suppress the statements he made during the agents' questioning of him and the evidence obtained from the search of the van. He too argued that the seizure was an arrest for which probable cause was required. Guadalupe further urged that the evidence should be suppressed because the DEA agents had failed to advise him

that, as a citizen of Mexico, he had a right to communicate with a consular officer of his country pursuant to Article 36 of the Vienna Convention on Consular Relations, April 24, 1963 art. 36, 21 U.S.T. 77.

On September 28, 1999, the district court denied both motions and the accompanying requests for evidentiary hearings. The court found that their confrontations with the agents did not violate the Fourth Amendment. Additionally, the court found that while the Vienna Convention had been violated, Guadalupe had not shown that the violation warranted exclusion of the evidence.

On the day that jury selection was set to begin, Guadalupe and Francisco withdrew their not guilty pleas and entered conditional guilty pleas on all three counts, reserving their rights to appeal the district court's denial of their suppression motions. After a thorough hearing, the court accepted the pleas (which were unaccompanied by any plea agreements) and entered judgments of conviction on October 19, 1999. Sentencing took place on July 13, 2000. At the hearing, Guadalupe and Francisco both requested reductions in their offense levels based on their "minor" roles in the conspiracy, U.S.S.G. sec. 3B1.2(b), as well as acceptance of responsibility, U.S.S.G. sec. 3E1.1. The court denied the motions and sentenced both Guadalupe and Francisco to 151 months on each count, to run concurrently, and five years of supervised release. Both defendants appeal the district court's denial of their separate motions to suppress, and Francisco also appeals the determination of his sentencing offense level.

III

The main issues in this case revolve around the encounters between the defendants and the police. Citizen-police encounters can be placed into three categories: the first category, a consensual encounter, involves no restraint on a subject's liberty and is characterized by non-coercive police questioning of a citizen who voluntarily cooperates. This is not a seizure within the meaning of the Fourth Amendment and

requires no objective justification. United States v. Mendenhall, 446 U.S. 544, 552-54 (1980).

The second category is an investigatory stop, which is limited to a brief, non-intrusive detention, often termed a Terry stop. See Terry v. Ohio, 392 U.S. 1 (1968). An "officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" that criminal activity is afoot. Berkemer v. McCarty, 468 U.S. 420, 439 (1984). An investigatory stop may also include a pat-down search. United States v. Feliciano, 45 F.3d 1070, 1072 (7th Cir. 1995). A Terry stop is subject to Fourth Amendment standards, but an officer need only have specific, articulable facts that give rise to a reasonable suspicion of criminal activity. Id. This level of suspicion is considerably lower than proof of wrongdoing by a preponderance of the evidence. United States v. Sokolow, 490 U.S. 1, 7 (1989).

When police actions exceed a short detainment, the seizure becomes a full-blown arrest, for which the police are required to have probable cause to believe that a person has committed or is committing a crime. Beck v. Ohio, 379 U.S. 89, 96-97 (1964). We will examine the stops with these Fourth Amendment "seizure" standards in mind.


A.  Guadalupe's Claims

1.  Denial of Evidentiary Hearing

We first address Guadalupe's challenge to the district court's decision to forego an evidentiary hearing before denying the motion to suppress. We review this determination for clear error, reversing only if we are left with a definite and firm conviction that an error has occurred. United States v. Rodriguez, 69 F.3d 136, 140 (7th Cir. 1995).

Upon examination of the record, we cannot say that the district court committed clear error in concluding that a hearing was unnecessary. It was Guadalupe's burden to establish the necessity of a hearing by demonstrating

that there was a disputed material issue of fact justifying relief. United States v. Randle, 966 F.2d 1209, 1212 (7th Cir. 1992). For the most part, Guadalupe's motion simply recited the facts contained in the DEA agent's affidavit supporting the criminal complaint. Contrary to the government's assertions, there was one potential area of dispute. DEA Agent Freyberger's affidavit stated that Guadalupe gave his consent to search the van while agents were questioning him in the residential neighborhood. Guadalupe's motion had a different version of the timing: he claimed that he signed the consent to search form after he returned to the McDonald's parking lot and saw the agents trying to open his van with a "slim jim." This dispute would have been material, however, only if Guadalupe had argued that seeing the slim jim procedure somehow made his subsequent consent involuntary. But Guadalupe made no such argument in his motion, and it is not up to us to construct something along these lines for him. (This holding is reinforced by Guadalupe's appellate counsel's statement in his brief that "[d]efendant's motion assumed as correct the facts averred in the [government's] Affidavit in Support of Criminal Complaint for purposes of arguing that those facts . . . do not constitute probable cause." Br. at 6, 13-14.)

Guadalupe also suggests that when he was forcibly "brought back" from the neighborhood to the van, the investigatory stop became an arrest for which probable cause was required. He maintains that a hearing was necessary to determine whether the encounter was either an arrest or merely a Terry stop. The problem with this argument is that it comes too late in the day. Nowhere in his motion to suppress did Guadalupe mention to the district court that the DEA agents used force when detaining him. Indeed, even in his brief to this court, Guadalupe did not describe the method by which he was "brought back" to the van. Although a careful look at the record reveals that Guadalupe mentioned at the plea hearing that the police handcuffed him and then brought him back in a police cruiser, he never focused on those facts as a ground for granting his suppression motion. Neither the district court nor this court is required to dig through the record to construct arguments a litigant

has not made. Guadalupe's repeated failure to clarify what specific "force" distinguished his case from other Terry stops amounts to a forfeiture of any possible argument he might have made based on those facts. His lack of attention to this point also means that the district court did not err in refusing to hold a hearing on the question of the degree of force used. Given the state of this record, we express no view on the question whether the exercise of control over his freedom of movement employed by the police here was enough to escalate the stop from a Terry stop to a full-blown arrest.

## 2. Seizure

The district court found that the agents' stop of Guadalupe in the neighborhood was a Terry investigatory stop supported by a reasonable suspicion of criminal activity. We review this determination de novo, although we review findings of historical fact for clear error and give due weight to inferences drawn from those facts by district judges and local law enforcement officers. See Ornelas v. United States, 517 U.S. 690, 699 (1996).

We see no clear error in the underlying facts the district court found, and on the basis of that record, we conclude that the agents' questioning of Guadalupe in the residential neighborhood qualified as at most an investigatory stop. Indeed, initially the agents were not even detaining him forcibly. They had not patted him down; they were simply questioning him about his identity and his whereabouts that day. To the extent that there was an investigatory stop, it was justified by a reasonable suspicion that drug trafficking was either about to happen or had already happened. Guadalupe had been observed in known drug-trafficking locations using pay phones. Earlier, the agents had found a large amount of cash and weapons in his apartment. On the day of the encounter, Guadalupe drove a van to a restaurant parking lot but then let someone else drive it, only to have it returned a few minutes later. Guadalupe then left the van behind after deliberately leaving the keys on the ground in the parking lot. These circumstances, taken as a whole,

were enough to arouse the suspicions of reasonable DEA agents and to justify the detention as a Terry stop.

### 3. Search of Van

Guadalupe also contends that he did not voluntarily consent to the search of the van. Thus, he claims, all of the evidence found in the van was the result of an illegal search. Had the consent to search the van been made in the midst of an illegal arrest, it may very well have been invalid as "fruit of the poisonous tree." See United States v. Sanchez-Jaramillo, 637 F.2d 1094, 1099-1100 (7th Cir. 1980) (excluding evidence found after consent given during illegal arrest). But if the investigatory stop was justified, as we have concluded this one was, we examine the consent only to see if it was "the product of an essentially free and unconstrained choice. . . ." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). Guadalupe has offered nothing to support a finding of involuntariness. The consent form was written in Spanish, Guadalupe's native language, and he signed it. He makes no argument that he was threatened or otherwise coerced into giving the consent. The fact that he was being questioned by police at the time is no basis for establishing involuntariness. See United States v. Cipriano, 765 F.2d 610, 612 (7th Cir. 1985) ("[T]here is nothing inherently coercive in an officer's identification of himself as a law enforcement agent and subsequent questioning.") Looking at the "totality of the circumstances," see Schneckloth, 412 U.S. at 227, Guadalupe has not shown that his consent was given unknowingly or involuntarily.

### 4. Vienna Convention Violation

Guadalupe also argues that any statements he made should be suppressed because the agents violated his rights under the Vienna Convention in failing to notify him that he had the right, as a Mexican citizen, to communicate with the Mexican consulate. He asserts that had he been informed of his right, he would not have given the incriminating statements. Although the district court judge found that the notice requirements of the Convention were not met, the judge found

that exclusion was not proper because Guadalupe had not shown that he was prejudiced by the violation of the Convention.

The district court decided this issue without the benefit of United States v. Lawal, 231 F.3d 1045 (7th Cir. 2000), in which this court held that exclusion of evidence was not the proper remedy for violation of a defendant's consular access rights under the Vienna Convention. See also United States v. Carrillo, 269 F.3d 761 (7th Cir. 2001); United States v. Chaparro-Alcantara, 226 F.3d 616, 624-25 (7th Cir. 2000). Although he acknowledged Lawal, Guadalupe has asked for exclusion anyway, in the hope that the Supreme Court would overturn Lawal. However, the Supreme Court has since denied certiorari in Lawal, 121 S.Ct. 1165 (2001). We too are not inclined to revisit the issue, and thus even if the Convention was violated, the district court correctly refused to suppress evidence on that ground.

B.  Francisco's Claims

1.  Seizure

Francisco also wanted to suppress the statements that he made when the agents questioned him, as well as the evidence obtained in the search of the Buffalo Grove house. He argued that the stop of his vehicle constituted an arrest for which probable cause was required, and that he was entitled to Miranda warnings before being questioned. The district court found that the stop was only a Terry stop and not an arrest, and that the officers had a reasonable suspicion of criminal activity. (Francisco had also requested an evidentiary hearing; he does not appeal the denial of that request.)

The chase of the Jeep Wrangler was certainly not a seizure--a show of authority, without any application of physical force, to which the suspect does not yield, is not a seizure. California v. Hodari D., 499 U.S. 621, 626-27 (1991). But Francisco argues that he was effectively arrested when his Jeep was trapped in the dead end. The government, again, argues that the stop was an investigatory stop and not an arrest.

Had Francisco simply chosen to stop his car and answer the government's questions, it would have been easy toconclude that this was a Terry stop for which there was adequate justification. Francisco, like Guadalupe, had been seen in high drug crime areas. By the time the officers stopped Francisco, they had already discovered cocaine in a van that was garaged at a house in which Francisco had been seen. The agents saw Francisco drive into his subdivision and then speed past his residence. See Illinois v. Wardlow, 528 U.S. 119 (2000) (unprovoked flight upon noticing the police is a pertinent factor in determining reasonable suspicion).

The question is whether the stop became an arrest when he was "cornered" in the dead end and had no choice but to stop and exit the car. We conclude that these circumstances were largely of Francisco's own making and thus did not transform the nature of the police conduct. A Terry stop is, after all, a brief involuntary detention. One of the ways the police might ensure compliance with their request for a person to stop is to cut off other avenues of escape. That is all that happened here. Once police have the reasonable suspicion required to justify an investigatory stop, they may use reasonable means to effectuate that stop. United States v. Weaver, 8 F.3d 1240, 1244 (7th Cir. 1993); Tom v. Voida, 963 F.2d 952, 958 (7th Cir. 1992). The stop in the dead-end street was necessitated by Francisco's attempts to evade the agents. It is also worth noting that in considering whether an investigatory stop has transformed into an arrest, "we consider whether the subject's own actions in resisting the legitimate efforts of police to stop and question him played a role in bringing about the challenged police conduct." Weaver, 8 F.3d at 1243. Neither the chase nor the ultimate stop in the dead end had the effect of transforming this particular traffic stop and the resulting conversation into an arrest.

Because the entire encounter was just a Terry stop, probable cause was not required. Nor were the police required at that stage to give Francisco his Miranda warnings. See United States v. Lennick, 917 F.2d 974, 977 (7th Cir. 1990). And, as already discussed, there was

sufficient justification for the investigatory stop. It follows that the consent to search the home was also valid and Francisco's claim of coercion must be rejected.

2. Denial of Sentencing Reduction for Minor Role

Francisco also contends that he should have received a two-point adjustment to his offense level under sec. 3B1.2(b) of the sentencing guidelines. Section 3B1.2(b) allows a judge to decrease the offense level by two "[i]f the defendant was a minor participant in any criminal activity." A minor participant is a participant "who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. sec. 3B1.2, comment (n. 3). The reduction is often used with a conspiracy charge to ensure that the defendant's sentence, which may be based on the "relevant conduct" of co-conspirators, does not reflect conduct other than his own. See United States v. Mojica, 185 F.3d 780, 791 (7th Cir. 1999).

At the sentencing hearing, Francisco bore the burden of demonstrating that the reduction was warranted. He chose to carry that burden by resting solely on his admission during his guilty plea and the government's version of the offense; he did not offer any additional evidence that may have supported his request. The district court denied the reduction and sentenced him accordingly. Because the district court's conclusion is heavily dependent on the facts, we review it only for clear error. See United States v. Lampkins, 47 F.3d 175, 180 (7th Cir. 1995).

On appeal, Francisco argues that he was clearly less responsible than Guadalupe since it was Guadalupe who drove the van to the meeting site to deliver the narcotics. Vargas stated in his plea admission, however, that he met with both of the defendants to negotiate the deal. Additionally, Francisco did not dispute that he was responsible for the safekeeping of the cocaine at the residence. Last, and in this circuit most important, the district court held him accountable only for the 50 grams of cocaine that were found in a house where

he was staying. In other words, he was sentenced only for drugs that he himself "had his hands on" at the house, which made the downward departure neither necessary, nor, under our interpretation of the existing guidelines, appropriate. See Lampkins, 47 F.3d at 180-81.

IV

We therefore Affirm the district court's orders denying both motions to suppress. We also Affirm the convictions and sentences of Francisco and Guadalupe Felix-Felix.