In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-3423, 00-3549, and 00-3694

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

VINETTE CROWLEY, JERRY HALLGREN,
and WILLIAM CROWLEY,

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 00-CR-0007-C--Barbara B. Crabb, Chief Judge.

Argued March 29, 2001--Decided March 29, 2002


  Before Easterbrook, Rovner, and Diane P.
Wood, Circuit Judges.

  Rovner, Circuit Judge.  William Crowley,
his wife Vinette Crowley, and his
brother-in-law Jerry Hallgren were
convicted of drug offenses stemming from
a conspiracy to distribute
methamphetamine in Superior, Wisconsin.
The Crowleys, who pleaded guilty, jointly
challenge on appeal the district court's
denial of their motion to suppress
evidence. Vinette Crowley also appeals
the district court's refusal to sentence
her as a "minor participant" in the
conspiracy. Hallgren, who went to trial,
appeals several aspects of his conviction
and sentence. We affirm the district
court's judgments in all respects.

BACKGROUND

I.  William and Vinette Crowley

  Sometime in 1992, federal authorities in
the Western District of Wisconsin began
to suspect that William and Vinette
Crowley were distributing
methamphetamine. Their home was the
subject of two search warrants; both
searches turned up evidence of
methamphetamine distribution, such as
scales, plastic baggies, and glass vials.
In 1997, authorities obtained a warrant

to seize a suspicious package intercepted by the U.S. Postal Service that was addressed to the Crowleys. A search revealed that the package contained two ounces of methamphetamine. Police then notified area delivery services, including the United Parcel Service ("UPS"), to watch for suspicious packages addressed to the Crowleys. The police directed that anyone discovering such a package should contact authorities.

On June 30, 1997, UPS driver Cathleen Champaigne noticed a package addressed to the Crowleys. Remembering that police were on the lookout for suspicious packages sent to the Crowleys, she opened the package. Inside she found a tobacco-like substance that she suspected was marijuana. She flagged down a county deputy sheriff and asked him to notify the Superior Police Department. The deputy sheriff, in turn, contacted Superior police officers Jerome Koneczy and Todd Maas, who were assigned to the narcotics unit.

Officers Koneczy and Maas caught up with Champaigne later that day as she was making a delivery. The three stood in Champaigne's truck while the officers questioned her about the package. Champaigne told the officers her suspicions about the package's contents. By this time, she had resealed the package for delivery. The police inspected the outside of the package and noted that it was similar to the package seized by the postal service earlier that month. Both packages had been addressed to "Mr. Mrs. Crowley, 726 Winter" with the state listed as "Wi" with no period, and both had been sent from California.

After inspecting the outside of the package, Officer Koneczy handed it back to Champaigne. He became momentarily distracted by a car pulling behind Champaigne's truck. Without warning, Champaigne reopened the package and began removing its contents. Among the items inside was a baggie containing what appeared to Officer Koneczy to be coffee grounds. From viewing the outside of the baggie, Officer Koneczy saw a hard, white substance hidden in the coffee grounds that he suspected was methamphetamine. The officers left and obtained a search warrant; a subsequent search revealed that the package contained 3.8 ounces of

methamphetamine.

Federal authorities continued to investigate the Crowleys' activities and in January 2000 obtained a three-countindictment against the Crowleys and Jerry Hallgren, Vinette Crowley's brother. Count 1 charged all three defendants with engaging in a conspiracy to distribute methamphetamine between November 1994 and February 1998, in violation of 21 U.S.C. sec. 846 and sec. 841. Counts 2 and 3 charged the Crowleys with possessing methamphetamine with intent to distribute, in violation of 21 U.S.C. sec. 841.

The Crowleys moved to suppress the package seized from the UPS truck, arguing that Champaigne had been acting as an "agent" of the police when she opened the package, and that her warrantless search violated the Fourth Amendment. A magistrate judge held an evidentiary hearing and recommended denying the motion. The magistrate judge concluded that Champaigne's actions could not be imputed to the police because she was "acting on her own, without having received any direction from the police" when she opened the package. The district court adopted the magistrate judge's recommendation and denied the motion to suppress.

Vinette Crowley subsequently entered a conditional plea of guilty to one count of attempted possession of methamphetamine with intent to distribute. Her plea agreement preserved her right to appeal the suppression issue. In the presentence report ("PSR"), the probation officer estimated that the conspiracy had involved 4,381 grams of methamphetamine. The probation officer recommended that Ms. Crowley be held responsible for approximately 850 grams of methamphetamine, representing amounts that two government witnesses admitted to shipping to the Crowleys from California over a period of months. The probationofficer noted that Ms. Crowley had handled the details of the shipments, including wiring money and tracking the "missing" packages that had been confiscated by law enforcement.

Based on her plea agreement, Ms. Crowley and the government both argued at sentencing that she should receive a

downward adjustment as a "minor participant" in the conspiracy. See U.S.S.G. sec. 3B1.2(b). The district court rejected this argument, finding that Ms. Crowley was not a "minor participant" in the transactions for which she was being held responsible, but instead was significantly involved in acquiring the California shipments. The court sentenced Ms. Crowley to 97 months' imprisonment, three years of supervised release, and a $100 special assessment.

William Crowley entered a conditional plea to the conspiracy count, also preserving the suppression issue for appeal. The probation officer recommended that Mr. Crowley be held responsible for the entire 4,381 grams as the conspiracy's leader. The district court accepted this recommendation and sentenced Mr. Crowley to 240 months' imprisonment, three years of supervised release, and a $100 special assessment.

II. Jerry Hallgren

Jerry Hallgren opted to go to trial. The government called ten witnesses, three of whom provided direct testimony linking Hallgren to the conspiracy. Hallgren's former live-in girlfriend, Brenda Johnson, testified that from 1992 to 1995 Hallgren made his living by selling methamphetamine obtained from William Crowley. Johnson testified that on one occasion she saw Hallgren in possession of a "golf ball"-size rock of methamphetamine, which he crushed and packaged into one-ounce plastic bags. Johnson further testified that following their break-up in 1998 she began providing information to the police about the Crowley's drug ring. She stated that sometime the following year Hallgren threatened her with becoming "another Daley case," referring to the unsolved murder of two Superior women.

Another government witness, Michael Shopa, testified that he purchased 1/8-ounce quantities of methamphetamine from Hallgren once or twice a month during 1996 and 1997. Shopa testified that when purchasing drugs he observed Hallgren in possession of four or five other small plastic bags containing what he presumed to be methamphetamine. The final witness linking Hallgren to the conspiracy was Ken Cowen, who supplied methamphetamine

to Crowley. Cowen testified that Hallgren was one of Crowley's dealers, and that Hallgren frequently owed money to Crowley for methamphetamine purchases that had been "fronted" to him for resale. Cowen further testified that he had packaged methamphetamine in Hallgren's attic while Hallgren was at home.

The jury returned a guilty verdict. The probation officer recommended that Hallgren be held responsible for distributing 1,134 grams of methamphetamine, an amount derived from trial testimony and interview reports. The probation officer estimated that Hallgren received at least one ounce of methamphetamine per month from William Crowley during the conspiracy. The probation officer also recommended that Hallgren receive a two-level increase in his offense level for obstructing justice based on his threat to Brenda Johnson, which had been made after the government sent William Crowley a "target" letter informing him that he was under investigation. The district court accepted these recommendations and sentenced Hallgren to 151 months' imprisonment, three years of supervised release, and a $100 special assessment.

ANALYSIS

I.  Motion to Suppress

The Crowleys argue on appeal that the district court should have suppressed the package seized from UPS because driver Cathleen Champaigne was acting as an "agent" of the police when she opened the package without a warrant. We review the district court's factual findings made in the context of a motion to suppress for clear error and its legal determinations de novo. United States v. Angle, 234 F.3d 326, 334 (7th Cir. 2000), cert. denied, 121 S. Ct. 2556 (2001).

A search or seizure by a private party does not implicate the Fourth Amendment unless the party is acting as an "instrument or agent" of the government. See United States v. Shahid, 117 F.3d 322, 325 (7th Cir. 1997); United States v. Koenig, 856 F.2d 843, 847 (7th Cir. 1988). In determining whether a private party acted as an "instrument or agent" of the government, we consider several factors, including whether the government knew of and acquiesced in the intrusive

conduct; whether the private party's purpose in conducting the search was to assist law enforcement; and whether the government requested the action or offered the private actor a reward. United States v. Hall, 142 F.3d 988, 993 (7th Cir. 1998); Shahid, 117 F.3d at 325. We conduct this analysis on a case-by-case basis in light of all the circumstances. Hall, 142 F.3d at 993. The defendant bears the burden of proving that a private party acted as an agent of the government. United States v. Feffer, 831 F.2d 734, 737 (7th Cir. 1987).

The first time Champaigne opened the package, the police were not present, nor had the officers ever spoken with Champaigne. The police had merely notified area delivery services to watch for suspicious packages and contact authorities; they did not instruct anyone, including Champaigne, to open any packages. The Fourth Amendment is not triggered when a private party initiates a search and contacts police after evidence is discovered. See Hall, 142 F.3d at 993. There is no evidence here that the police controlled, directed, condoned, or acquiesced in Champaigne's initial decision to open the package. See Shahid, 117 F.3d at 325. Accordingly, her actions cannot be imputed to the police.

Although the police were present when Champaigne re-opened the package, the district court found no suggestion that the officers gave Champaigne a "wink-and-a-nudge," or otherwise encouraged her to show them the contents of the package. Rather, the court credited Officer Koneczy's testimony that the officers were surprised when Champaigne re-opened the package, and we defer to the court's credibility determination. See United States v. Woods, 233 F.3d 482, 484-85 (7th Cir. 2000). The mere fact that the police witness a private party's search does not transform the private party into a governmental agent. See United States v. Smythe, 84 F.3d 1240, 1243 (10th Cir. 1996).

Champaigne's motivation to assist law enforcement does not change the result in this case. "Concern about the effects of crime on the public at large is not a vice which one must assume signifies a conspiracy with the government, but a cherished, commonly held, and wholesome

virtue." Koenig, 856 F.2d at 851. The key here is that the officers did not induce Champaigne to act. See id. at 850; Shahid, 117 F.3d at 327. There is no suggestion that Champaigne expected either a benefit for opening the package or a detriment for not opening the package. See Shahid, 117 F.3d at 327; Feffer, 831 F.2d at 737. In other words, Champaigne acted out of her own desire to help the police and not as their agent. "Private parties may, of their own accord, pursue the same objectives they have set for their elected officials without acquiring the legal status of governmental agent." Shahid, 117 F.3d at 326. The district court thus properly rejected the Crowleys' Fourth Amendment claim.

## II.  Vinette Crowley's Sentence

   Vinette Crowley also challenges her sentence, arguing that the district erred in refusing to grant her a minor role reduction pursuant to U.S.S.G. sec. 3B1.2. Section 3B1.2(b) allows a judge to decrease the offense level by two points "[i]f the defendant was a minor participant in any criminal activity." U.S.S.G. sec. 3B1.2(b); United States v. Felix-Felix, 275 F.3d 627, 636 (7th Cir. 2001). A defendant seeking a minor role reduction bears the burden of proving by a preponderance of the evidence that he or she was "substantially less culpable" than the other coconspirators. See U.S.S.G. sec. 3B1.2, comment (n. 3); Felix-Felix, 275 F.3d at 636. Because the district court's decision to grant a minor role reduction is heavily dependent on the facts, we review it only for clear error. Felix-Felix, 275 F.3d at 636; United States v. Carrillo, 269 F.3d 761, 770 (7th Cir. 2001). We note that the reduction is meant to be granted infrequently. See United States v. Navarro, 90 F.3d 1245, 1263 (7th Cir. 1996).

   The comparative roles of conspirators are an important, but not determinative, consideration in whether to grant a minor role reduction. See United States v. Kerr, 13 F.3d 203, 206 (7th Cir. 1993). One person might be the "driving force" behind a criminal scheme, but a defendant who plays an integral role by assisting with that scheme is not eligible for a minor role reduction. See Navarro, 90

F.3d at 1263. The evidence here suggests that Ms. Crowley was not a minor participant in the conspiracy, but instead played an integral role in assisting her husband's drug operation. See id.

In the PSR, the probation officer noted that Vinette Crowley "had an active role and took a number of steps to assist her husband in the distribution of methamphetamine." One witness described her as William Crowley's "business partner," who sold drugs out of their residence. Another witness observed Ms. Crowley purchase methamphetamine from a supplier. Two suppliers stated that Ms. Crowley had handled the details of several drug shipments they sent from California by wiring money and tracking packages. Despite the fact that William Crowley played a relatively greater role in the conspiracy, the district court did not clearly err in denying Vinette Crowley's request for a downward adjustment. See United States v. Cain, 155 F.3d 840, 844 (7th Cir. 1998) (defendant who provided "necessary services" to conspiracy, such as driving passenger to drug deals and renting apartment used to store drugs, was not entitled to minor role reduction); United States v. Brooks, 957 F.2d 1138, 1149 (4th Cir. 1992) (defendant who sells drugs does not have minor role in drug conspiracy). Moreover, a minor role reduction was particularly unnecessary here because the district court held Ms. Crowley responsible only for drugs that she herself obtained. See Felix-Felix, 275 F.3d at 637. Accordingly, we affirm Ms. Crowley's sentence.

III.  Jerry Hallgren's Conviction

On appeal, Hallgren raises three trial errors that he argues warrant reversal of his conviction. He first contends that the district court should have ordered the government to produce an alleged statement from government witness Michael Shopa pursuant to the Jencks Act, 18 U.S.C. sec. 3500. He next argues that the court should have allowed him to introduce bank records belonging to a "Jerry Obie," which he argues would have supported a mistaken identity defense. He last contends that the court abused its discretion in allowing a transcript of Michael Shopa's testimony to be read to

the jury.

A.   The Jencks Act

The Jencks Act requires that after a government witness testifies, and upon the defendant's motion, the government must produce any prior statement the witness made that relates to the subject matter of the witness's testimony. See 18 U.S.C. sec. 3500(b); United States v. Johnson, 200 F.3d 529, 533 (7th Cir. 2000). The Jencks Act does not obligate the government to disclose investigative or trial preparation material; rather, it requires only the disclosure of pretrial statements a government witness signed, adopted, or otherwise approved. Johnson, 200 F.3d at 533.

Hallgren argues that he did not receive Jencks material for government witness Michael Shopa and was therefore "unfairly surprised" by Shopa's testimony. There is no question that counsel made a timely motion for the disclosure of Jencks material. However, the government asserted at trial, and continues to assert on appeal, that it possessed no pretrial statement for Shopa, and that there was therefore nothing to disclose. The district court accepted this representation and allowed the trial to go forward. Defense counsel did not request a hearing on the existence of any Jencks material, nor did he question Shopa on cross-examination about whether he had given a prior statement to law en forcement. On redirect examination by the government, Shopa testified that he was not subpoenaed until the Friday preceding trial and that no one had interviewed him prior to his pretrial meeting with prosecutors. Hallgren points out on appeal that when asked by the government whether "prior to that had you been contacted or interviewed about this man?" Shopa replied without elaboration, "Yes, I had."

This apparent contradiction notwithstanding, we find no error in the district court's acceptance of the government's representation that no Jencks material existed. If Hallgren wished to pursue this claim, he should have informed the district court about the potential contradiction created by Shopa's testimony. See Johnson, 200 F.3d at 536. Because there is nothing in the

record to definitively show that Shopa gave a prior statement covered by the Jencks Act, we will not speculate about the existence of such a statement on appeal. See id.; cf. United States v. Starnes, 644 F.2d 673, 680 (7th Cir. 1981) (holding that defendants forfeited their argument that the prosecutor failed to provide exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), by failing to explore the issue on cross-examination of government agents or by seeking a hearing in the district court). Hallgren did not properly develop the record on this point below, and we can find no error in the district court's handling of this issue.

B.  Other alleged trial errors

We need not tarry with Hallgren's remaining challenges to his conviction. He first asserts that the trial court erred in refusing to admit bank records pertaining to a "Jerry Obie," which he argues would have supported a mistaken identity defense. Hallgren asserts that it was Jerry Obie  and not he who was William Crowley's "right hand man"; the bank records purportedly showed that Obie had lived with the Crowleys during the conspiracy. We cannot conclude that the district court abused its discretion in refusing to admit these records. See Angle, 234 F.3d at 343. As the court observed, whether some other person was also involved in the conspiracy in no way related to Hallgren's guilt. See United States v. Krankel, 164 F.3d 1046, 1048 (7th Cir. 1998) (district court properly excluded evidence that did not tend to prove or disprove an element of the crime charged). Moreover, the witnesses who testified to Hallgren's direct involvement in the conspiracy knew him well and were not likely to be mistaken about his identity: Brenda Johnson was his live-in girlfriend for three years and the mother of his child; Michael Shopa testified that he knew Hallgren since 1989; and Kenneth Cowen testified that he and Hallgren had been friends since 1986. Accordingly, the district court's refusal to admit the bank records was proper.

Hallgren also contends that the court should not have allowed a transcript of Michael Shopa's testimony to be read to

the jury. We have held that such a determination is uniquely committed to the discretion of the trial court. United States v. Berry, 133 F.3d 1020, 1023-24 (7th Cir. 1998); United States v. Guy, 924 F.2d 702, 708 (7th Cir. 1991). The trial judge should consider the "reasonableness of the request, the ease or difficulty in compliance, and what is likely to be gained or lost." United States v. Aubin, 961 F.2d 980, 983 (1st Cir. 1992) (citations and internal quotations omitted). Having reviewed the record, we cannot see how the court abused its discretion on this point. The court allowed the testimony to be read only after the jury, for the second time, raised a question about a critical aspect of Shopa's testimony--his drug purchases from Hallgren. See Berry, 133 F.3d at 1023-24. The reading took less than 20 minutes, and the court instructed the jury not to give Shopa's testimony undue weight. See Aubin, 961 F.2d at 983. Accordingly, we reject Hallgren's argument.

IV.  Hallgren's Sentence

Hallgren next challenges his sentence, arguing that the district court erred in calculating drug quantity and in assessing him a two-point upward adjustment for obstruction of justice. We review both determinations for clear error. See United States v. Johnson, 227 F.3d 807, 813 (7th Cir. 2000), cert. denied, 532 U.S. 1024 (2001).

In calculating Hallgren's sentence, the district court counted as relevant conduct 1,134 grams of methamphetamine. The court based its calculation on the trial testimony of Brenda Johnson and Michael Shopa, as well as a statement given to law enforcement by Natasja Brech, another former girlfriend of Hallgren's. In particular, Johnson testified that for three years Hallgren made his living by selling drugs for Crowley, and that she witnessed him in possession of a "golf ball"-size rock of methamphetamine, which he crushed and packaged for resale. Michael Shopa testified that he purchased 1/8-ounce amounts of drugs from Hallgren once or twice a month during a two-year period, and that on those occasions he witnessed Hallgren in possession of several other 1/8-ounce bags of methamphetamine.

Natasja Brech told law enforcement that she had obtained a little more than an ounce of methamphetamine from Hallgren during a six-week period in 1995. Based on this evidence, the district court estimated that Hallgren was responsible for selling approximately one ounce of methamphetamine per month during each month of the conspiracy.

Hallgren asserts that the court's calculation was clearly erroneous because "no witness testified that he [sold drugs] for every single month during the conspiracy." Hallgren misunderstands the nature of the district court's task. No one disputes that the 1,134-gram figure was an estimate of the amount of methamphetamine Hallgren sold. But district judges calculating drug quantities "are not required to act like agents of the Bureau of Weights and Measures." Berry, 133 F.3d at 1024. Estimates are permissible, so long as they represent reasonable assumptions based on reasonably accurate information. Id. Here the district court made a reasonable assumption regarding the amount of methamphetamine Hallgren sold based on the evidence in the record. See Johnson, 200 F.3d at 537. Accordingly, we decline to find the court's drug-quantity calculation clearly erroneous.

Hallgren next argues that the government did not meet its burden of proving by a preponderance of the evidence that he obstructed justice. See United States v. Noble, 246 F.3d 946, 953 (7th Cir. 2001). At sentencing, the government argued that Hallgren threatened Brenda Johnson shortly after authorities sent William Crowley a "target" letter informing him that he had become the focus of a federal criminal investigation. The government argued that Hallgren knew Johnson had witnessed his drug-dealing and that he must have surmised--correctly, it turns out--that Johnson was providing information to the government.

Hallgren does not dispute that threatening a witness amounts to obstruction of justice. See U.S.S.G. sec. 3C1.1, comment 4(a); United States v. Johnson, 227 F.3d 807, 814 (7th Cir. 2000), cert. denied, 532 U.S. 1024 (2001). Nor does he deny threatening Johnson; instead he claims that the government failed to prove a sufficient

"nexus" between his threat and Johnson's statements to police. Hallgren argues that he threatened Johnson in 1997 during an unrelated dispute, long before the Crowleys knew that they were under federal investigation. In support Hallgren cites his wife's testimony that she witnessed an altercation between Johnson and Hallgren in 1997. His father-in-law also testified that he recalled Hallgren telling him that same year about an altercation he had with Johnson.

In contrast, the government cites Johnson's testimony that she ran into Hallgren at a gas station in 1999, shortly after she had been interviewed by the police. She stated that Hallgren approached her and threatened to make her "another Daley case." Johnson was aware that the "Daley case" referred to the unsolved murder of two Superior women, and his threat frightened her. She was also aware that Hallgren's sister, Vinette Crowley, had been charged with but not convicted of the Daley murders.

Johnson's testimony was not inherently implausible, nor was it necessarily contradicted by the defense witnesses who testified about an altercation between Hallgren and Johnson in 1997. Hallgren points to nothing in the record to suggest that the district court's decision to credit Johnson's testimony constituted clear error. See Johnson, 227 F.3d at 815; see also Noble, 246 F.3d at 953 ("In the absence of inconsistency in a witness's story, we defer to the district court's determination of witness credibility, which can virtually never be clear error.") (citations and internal quotations omitted). This is not the rare case where we are left with the firm belief that an error has been made, and, accordingly, we affirm the upward adjustment for obstructing justice. See Johnson, 227 F.3d at 815.

For all of the foregoing reasons, the judgments of the district court are AFFIRMED.