MUTUAL MEDICAL PLANS, INC. and Ron Jones, Individually, Plaintiffs,

v.

COUNTY OF PEORIA, Kevin Lyons and Frank Walter, Defendants.

County of Peoria, Counter–Plaintiff,

v.

Mutual Medical Plans, Inc., and Ron Jones, Individually, Counter–Defendants.

No. 01–1469.

United States District Court, C.D. Illinois.

March 16, 2004.

Thomas Wilson, Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, IL, for Plaintiffs/Counter–Defendants.

James Sotos, Michael Bersani, Jason Rose, Kimberly Fahrbach, Hervas, Sotos, Condon & Bersani, Itasca, IL, for Defendants/Counter–Plaintiff.

## ORDER

MIHM, District Judge.

Before the Court is Defendant Frank Walter's Motion for Summary Judgment [# 86]. For the following reasons, the Motion is GRANTED. The Court declines to retain jurisdiction over the state law Counter–Claim and, therefore, it is DISMISSED without prejudice so that it may be re-filed in state court.

## Background

This case arises out of the criminal investigation and prosecution of Plaintiff, Ron Jones ("Jones"), the owner and president of Mutual Medical Plans, Inc. ("Mutual Medical" or "The Company"). Mutual Medical is an Illinois corporation whose primary business is the third party administration of employer-sponsored health benefit plans. Kevin Lyons ("Lyons") is the Peoria County State's Attorney and Frank Walter ("Walter") is an investigator employed by that office.

In its capacity as a third party administrator, Mutual Medical also brokered Safeco Company's ("Safeco") reinsurance products to the health plans that it serviced. This relationship was somewhat unique in the sense that it granted Jones the right to approve increases in the rates charged by Safeco for reinsurance to Jones' clients. The ability to increase the rates was contingent upon Jones' block of business, which at the time was comprised of approximately 63 employer health benefits plans, not exceeding certain levels of loss as a group.

In addition to commissions paid from Safeco to Jones and Mutual Medical, Mutual Medical was eligible to receive an annual "profit bonus" equal to one half of the profit earned by Safeco on Jones' reinsurance clients after deductions were made for losses, reserves, conversion charges, pooling charges, and a target profit established by Safeco. Between 1995 and 1998, Mutual Medical's profit bonuses were $260,361, $840,541, $601,730 and $523,624, respectively. The Company did not receive a profit bonus in 1999.

Mutual Medical, as a third party administrator, was responsible for processing and paying medical charges of employees and defendants who were covered by the health care plans it serviced. The Company was also responsible for making sure that its clients obtained reimbursement from the reinsurer, Safeco, whenever the claims incurred by an individual covered under a client's health care plan exceeded the plan's "stop-loss" or deductible point in a particular premium year. The profit bonuses received by Mutual Medical were largely dependent upon the total dollar amount in reinsurance claims that were paid by Safeco within a calender year.

The background for this lawsuit centers on three cases in which Mutual Medical served as the third party administrator for health care plans purchased from Safeco. These three cases will be referred to as the Wolfe, Boren, and Wilson cases.

### The Wolfe Case

From July 1, 1992, to April 30, 1998, Mutual Medical served as the third party administrator for the self-funded benefit plan offered by PMP Fermentation Products, Inc. As part of its plan, PMP purchased individual excess loss insurance coverage from Safeco, under which Safeco would reimburse PMP for claim payments made in a reinsurance contract year (July 1st to June 30th) above the first $20,000 per person. On August 25, 1996, Mindy Wolfe, the wife of PMP employee Mitch Wolfe, prematurely gave birth to twin boys at OSF St. Francis Hospital (OSF) in Peoria. Drew and Derek Wolfe were hospitalized from August 25, 1996, through November 2, 1996.

The OSF bills for the twins collectively totaled over $309,000. After receiving the bills in the fall of 1996, and early 1997, Jones and Mutual Medical claimed that the bills were excessive and, therefore, did not submit them to Safeco for reimbursement.

On June 27, 1997, Jones requested that Safeco extend the time period for PMP to submit claims for reinsurance on the Wolfe twins an additional 12 months, so that PMP would not be charged another set of deductibles. In his letter requesting the extension, Jones suggested that the poten-

tial reinsurance claim savings on the case was $200,000 or more. Safeco agreed to extend the time period, but only for an additional two months. Without notifying PMP officials[1], in July of 1997 Mutual Medical hired a company, Preferred Payment Systems (PPS), to attempt to negotiate the bills, but OSF refused to consider that option and, the bills remained unpaid prior to the expiration of the extension period.[2]

On October 29, 1997, Jones wrote a check from Mutual Medical's account to OSF for partial payment of the Wolfe's bill in the amount of $145,904[3] and an additional amount of $3,445.47 to the Wolfes to reimburse them for their expenses. The bill was not submitted to Safeco for reimbursement.

On March 27, 1998, PMP terminated Mutual Medical as its third party administrator for reasons unrelated to the Wolfe case. Shortly thereafter, PMP Human Resources Director Randy Niedermeier ("Niedermeier") spoke with Jones, and it was revealed to PMP, for the first time, that the Wolfe matter was still unresolved by Mutual Medical.

On April 30, 1998, Niedermeier sent a letter to Jones demanding that Mutual Medical pay the balance of the Wolfe claim immediately. Shortly thereafter, the remaining balance of $163,400 was paid, and the charges were submitted to Safeco for reimbursement. Safeco reimbursed PMP $123,400 ($163,400 $40,000 deductible) on July 15, 1998.

If the bills had been paid by Mutual Medical in the first eight months of 1997, Jones' profit bonus would have been reduced by $154, 652. However, since Mutual Medical ultimately submitted $123,400 to Safeco for reimbursement in July, 1998, Jones' 1998 profit bonus was decreased by only $61,700. As a result, the "net" increase to Mutual Medical's profit bonus was $92,952. Because the Wolfe's bills were not paid during the 1996–1997 policy year, PMP was forced to pay an additional $20,000 deductible for each twin.[4]

### The Wilson Case

Peoria County has a self-funded employee benefit plan to provide health insurance benefits to its employees and their dependents. Mutual Medical served at all relevant times as the third party administrator. Peoria County purchased excess loss insurance coverage from Safeco, which provided reimbursement for payments made in a reinsurance contract year above the first $150,000 per person.

On May 13, 1998, Tanisha Wilson, the wife of a Peoria County employee, prematurely gave birth to her daughter, Aalis, at OSF. Aalis remained at the hospital until she was discharged on July 23, 1998. Payment was made on the first and third interim hospital bills, totaling approximately $118,000, in August and October, 1998. OSF records indicate that on July 2, 1998, the hospital sent Mutual Medical, by certified mail, the second interim bill in the amount of $73,228 for the care provided to

1. Jones did meet with the Wolfe couple and asked for their permission to use their case as an opportunity to challenge OSF's billings. In exchange, Jones agreed to pay the Wolfe's out of pocket expenses, co-insurance costs, and deductibles.

2. PPS notified Mutual Medical in August of 1997 that the 86% of the total bill was within reasonable and customary limits and recommended that the bill be paid per plan benefits.

3. Neither Ron Jones nor Mutual Medical was ever given authority to pay a reinsurance claim on behalf of Safeco. Jones claims that the amount paid was average for the services provided.

4. Other non-OSF bills of the Wolfe's had been paid and PMP met its deductible of $20,000 per claimant by June 30, 1997, the end of PMP's policy year.

Aalis. Although OSF records also indicate that a Mutual Medical employee received and signed for this certified mailing on July 16, 1998, Mutual Medical claims that it never received it.[5]

On February 10, 1999, an OSF representative called Jones on an unrelated matter, at which time Jones told the representative that if OSF had any unpaid bills for Mutual Medical's clients, it should re-bill the account. A reprint of the $73,228 bill was mailed to Mutual Medical on February 12, 1999, and was paid in full shortly thereafter.

Because the second interim bill was not paid by Mutual Medical in 1998, Peoria County never reached its "stop-loss" point of $150,000 on expenses for Aalis Wilson. If Mutual Medical had paid OSF's second interim bill of $73,228 in 1998, Peoria County would have been entitled to receive reimbursement from Safeco in the amount of $61,378, and Jones' profit bonus would have been reduced by $30,689.

### The Boren Case

Mutual Medical was the third party administrator for Pike County's benefit plan. Pike County ("Pike") also purchased individual excess loss insurance coverage from Safeco which would reimburse Pike for payments made in a reinsurance contract year above the first $15,000 per person.

An employee of Pike, Janet Boren ("Boren"), received knee surgery on October 21, 1999, at Hannibal Regional Hospital ("Hannibal"). Hannibal mailed Mutual Medical a bill on November 4, 1999, in the amount of $14,338.50. However, because this bill did not include an itemization of the medical services provided, Mutual Medical returned that bill with a request, as it claims was customary, that the hospital provide an itemization of the services provided. Hannibal sent Mutual Medical

an itemized bill on January 12, 2000. Mutual Medical paid the bill in full on January 27, 2000.

Boren had also incurred other medical bills in connection with her knee surgery that were paid by Mutual Medical in 1999. Thus, Pike County could have recouped a portion of the $14,338.50 bill, had the bill been paid in 1999. Because of the delay in payment, Pike County lost $3,451 in reinsurance that it otherwise would have received from Safeco.

### Peoria County Initiates the Investigation

In May of 1999, Peoria County's Risk Management Assistant, Sandy Cheeseman, reported to the Management Services Subcommittee of the Peoria County Board that the County lost "a considerable reimbursement" because Mutual Medical had not paid the claims incurred at OSF by the Wilsons in a timely manner. Cheeseman also noted that Mutual Medical paid the third interim bill first and the first interim bill second and that, even if Mutual Medical had not received the second bill, "they should have questioned the service dates on the [third interim] billing which was the first paid."

During the meeting, the Committee chairman informed the Committee that Jones was both an agent of the County's reinsurer Safeco, and that Jones received a profit sharing percentage if the payouts made by Safeco in a given year did not exceed certain dollar amounts. According to the minutes of that meeting, "the Committee felt that this was a conflict of interest" and that the State's Attorney's office should investigate the matter. The request was memorialized in a formal letter to the State's Attorney.

---

**5.** It is undisputed that the custom and practice at Mutual Medical was for Jones to be notified immediately upon receipt of any bill in excess of $10,000.

Shortly after the May 25, 1999, Committee meeting, the State's Attorney's Office began a criminal investigation of Jones. Walter conducted the investigation, which began on or about June 28, 1999. On October 14, 1999, Lyons contacted Safeco's in-house legal counsel and advised her that Jones had held up the Wilson bills in 1998. On October 18, 1999, Lyons sent Safeco's counsel a letter indicating his belief that Jones had acted in a deliberate manner, causing Peoria County a total loss of $63,654. The letter asked for the "continued cooperation of Safeco personnel" as the investigation by the State's Attorney's Office continued. After learning of Peoria County's investigation of Mutual Medical and Jones, Safeco opened its own concurrent investigation.

In March of 2000, Safeco scheduled an audit of Mutual Medical for the week of April 24–28, 2000. On April 18, Walter faxed to Safeco Investigator Joe Kemper ("Kemper") more than 25 pages of material regarding the Wolfe claim, telling Kemper that he might find the "material interesting to review before arriving." From this and other communications, Kemper had complied a list of files of interest that the audit group would review.[6] In the morning of the first day of the audit, Kemper and Safeco auditor Mark Olson ("Olson") arrived at Mutual Medical's offices and indicated that they were there to review files as part of a routine audit, which normally would cover only pending reinsurance claims. Over the course of the week long audit, the Safeco employees were given access to numerous files, including the closed claim file relating to Drew and Derek Wolfe.[7] That evening,

the Safeco employees, now joined by auditor Joanna Rhule ("Rhule"), met with Walter over dinner, where the group discussed what to look for in the Wolfe file. In the evening of the second day of the audit, April 25, the Safeco employees met once again with Walter and the group discussed the day's audit. During the meeting, Walter requested a copy of the notes Rhule took when reviewing the Wolfe file, which she provided on April 28, 2000, after she received the authority to do so from Olson.

At the conclusion of the meeting on April 25, Kemper informed Walter that he had taken the Wolfe file with him when he left Mutual Medical's offices around 5:30 p.m. Unknown to Walter, Kemper had neither asked for, nor received Mutual Medical's consent to remove the file. When asked by Walter whether he had the legal right to take the file, Kemper assured Walter that he did. Walter then allowed Kemper to copy the file at the State's Attorney's Office. It is undisputed that Walter had no knowledge that Kemper was going to remove or had removed the file prior to that point in time. It is also undisputed that Walter did not review the file or request a copy. At some point that evening, a Mutual Medical employee discovered that the Wolfe file was missing and contacted Olson at his hotel. Olson subsequently spoke with Kemper, who acknowledged that he had it in his possession. Kemper returned the file to Mutual Medical's offices later that same evening.

In May and June, 2000, Assistant State's Attorney Stephen Pattelli presented the matter to the grand jury.[8] Walter, as the sole witness, provided testimony, on five

---

6. It is unclear from the record whether and to what extent Walter contributed to the list of files.

7. The auditors did not receive the Wolfe file until Tuesday, because it was in storage and it took 24 hours to retrieve it.

8. On May 16, 2000, the grand jury issued a subpoena directing Safeco to produce all documents in its possession relating to the Wolfe twins, including copies of all notes and memoranda from the audit of Mutual Medical.

separate occasions, relating to the Wolfe, Wilson, and Boren cases for the purpose of procuring an indictment against Jones. On June 27, 2000, the grand jury indicted Jones on seven counts of theft and a judge issued a warrant for his arrest. Upon learning of his indictment, Jones turned himself in to Walter at the Peoria County Jail. He was booked, posted bail, and was released approximately 30 minutes later. The criminal case against Jones proceeded to a jury trial on February 26, 2001. Walter did not testify at the trial. On March 6, 2001, the judge dismissed some of the charges at the close of the State's case. Three days later, the jury returned "not guilty" verdicts with respect to the remaining charges. Following these events, on November 26, 2001, Mutual Medical and Jones filed a Complaint under § 1983 asserting violations of the Fourth Amendment, as well as state law malicious prosecution claims. Lyons, Walter, and Peoria County filed a motion to dismiss, which this Court granted, without prejudice, on August 28, 2002. Mutual Medical and Jones then filed an Amended Complaint on October 11, 2002. On March 1, 2002, Peoria County was voluntarily dismissed as a defendant, without prejudice.

Meanwhile, on February 4, 2002, Peoria County filed a Counter–Claim against Mutual Medical and Jones. In an Order filed on August 10, 2002, the Court granted the Plaintiff's Motion to Dismiss the Counter–Claim, without prejudice. On October 9, 2002, Peoria County filed an Amended Counter–Claim alleging breach of contract and breach of fiduciary duty. The Court granted the Plaintiff's Motion to Dismiss Count II (breach of fiduciary duty) of the Counter–Claim in an Order issued on February 24, 2003.

On July 9, 2003, the Court accepted a stipulation filed by the parties, whereby a Motion for Rule 11 Sanctions, previously filed by Lyons, was withdrawn and, in turn, Lyons was dismissed from the case with prejudice.

Walter filed a Motion for Summary Judgment as to all of the claims asserted by the Plaintiffs. This Order follows.

### Standard of Review

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be de-

nied where a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995).

### Discussion

### I. *Fourth Amendment Claims*

█ Count I of the Plaintiffs' Amended Complaint alleges violations of the Fourth Amendment based on Walter's role in the audit of Mutual Medical's files by employees of Safeco during the week of April 24, 2000. Specifically, the Plaintiffs allege that Safeco officials acted as agents of the State during the course of the Mutual Medical audit and that the officials improperly gained access to and seized information at Walter's request. Although the Complaint and earlier pleadings did not clearly define the scope of the Fourth Amendment claims, it became clear at oral argument, based on questions posed by the Court to Plaintiffs' counsel, that the claims include not only the seizure and removal of the Wolfe file, but also the search of the Wolfe file and other files and documents located in Mutual Medical's office. After much reflection, the Court finds that Walter's role in the audit did not transform the private search into one controlled by the government because the purpose of Safeco's cooperation with the State's Attorney's office was not primarily to assist law enforcement, but to serve Safeco's independent, legitimate, and private interests.

For several months prior to the audit, Safeco maintained significant interaction with Peoria County officials, including Walter, and there is no dispute that Safeco could properly cooperate with the State's Attorney's Office by exchanging information concerning Mutual Medical and Jones.[9] By the time the Safeco employees arrived in Peoria, the record reflects that Kemper had compiled a list of files, based in part on information received from Walter, that the audit would cover. That list was presented to Mutual Medical employees on the morning of the first day of the audit. Safeco officials also met with Walter in the evenings of the first day and second day of the audit, at which time, Walter and the Safeco employees discussed the day's findings.

Mutual Medical and Jones go to great lengths presenting evidence, including copies of letters, faxes, handwritten notes, e-mails, and signed releases, designed to show collusion between Safeco officials on one hand and Kevin Lyons and Frank Walter on the other. However, the only defendant remaining in this case is Frank Walter and the actions of a prior defendant may not necessarily be imputed to him.

Although the Plaintiffs claim there is some dispute as to whether Safeco had right of access to every file in Mutual Medical's offices, the record suggests otherwise. For example, PMP's Excess Loss Insurance Policy states that PMP "must allow us to review and copy, during normal business hours, all records affecting our liability under the contract." (Pl.Ex.50, pg.888). Furthermore, the contract states that "If you use the services of an administrator to perform any functions for your plan, the administrator performs as your agent."[10] (Pl.Ex.50, pg.888). As PMP's

---

9. Although the earlier reference to Walter faxing information to Kemper regarding the Wolfe file is important for background in this case, there is no direct or circumstantial evidence in the record that the faxed documents constituted a request or an order to conduct a search of the Wolfe file.

10. However, the fact that Mutual Medical was considered an agent of PMP for auditing purposes, does not mean that Mutual Medical could, as Plaintiffs suggest, assert a privacy interest in this context on behalf of PMP.

agent, Mutual Medical was required to share any file that affected Safeco's liability.[11][12] In addition, Jones acknowledged in his deposition that Safeco had a right to review Mutual Medical's files. The issue, therefore, is not whether Safeco had access to Mutual Medical's files, but, instead, whether through Walter's interaction with the Safeco employees, they were transformed into agents of the state for the purposes of the Fourth Amendment.

 A search or seizure by a private party does not implicate the Fourth Amendment unless the party is acting as an "instrument or agent" of the government. *See, United States v. Shahid,* 117 F.3d 322, 325 (7th Cir.1997). Pre-search contact between a government official and a private citizen, whether or not intended by the official to prompt the citizen to render some type of assistance, does not, by itself, turn a private party into an agent of the government. *See, generally,*1 Wayne R. LaFave, *Search and Seizure:* a Treatise on the Fourth Amendment § 1.8(c), at 239–247 (3d ed.1996). In determining whether a private party acted as an "instrument or agent" of the government, the Seventh Circuit has devised a test involving certain factors, including whether the government knew of or acquiesced in the intrusive conduct; whether the private party's purpose in conducting the search was to assist law enforcement or further its own ends; and whether the government requested the action or offered the private actor a reward. *U.S. v. Crowley,* 285 F.3d 553, 558 (7th Cir.2002). Such an analysis is conducted on a case-by-case basis in light of all the circumstances. *Id.*

The first *Crowley* factor, whether the government knew of or acquiesced in the intrusive conduct, clearly weighs in favor of the Plaintiffs. Although the record does not support a finding that Walter specifically requested that an audit be conducted by Safeco, when one was scheduled, Walter concedes that he specifically requested that certain files be reviewed by the auditors. If something unusual was found during the review, Walter knew that the auditors would report the findings back to him and, on at least one occasion, he even asked one of the auditors for (and received) a copy of the notes she took when reviewing the Wolfe file.

With regard to the second *Crowley* factor, whether the private party's purpose in conducting the search was to assist law enforcement or further its own ends, Safeco's legitimate and independent interest in conducting the audit prevents the search of the files from being classified as governmental, rather than private, for the purposes of the Fourth Amendment. There can be no real dispute that Safeco initiated its own investigation in part to look into the possibility of fraud and serve its own interests, which, among others, must have included the protection of its reputation, a desire to maintain honest business relationships, the retention of its state issued license to deal in the insurance industry, and concerns of becoming a defendant in a civil suit filed by one of Jones' clients.

With regard to the third *Crowley* factor, there is no evidence in the record, either

**11.** Although the Plaintiffs would make the argument that the Wolfe claim file, which was closed, did not affect Safeco's liability under the contract, that interpretation is too narrow. The wording is clearly broad enough to allow review of files where claims have already been paid to assess the validity of the claims and review the reimbursement process.

**12.** Although the contract entered into with PMP is the only one included in the record, the parties agreed at oral argument that all of Safeco's Excess Loss Insurance policies contain similar language.

direct or circumstantial that Safeco was ever rewarded for their cooperation with the government. Nor is there any evidence that Safeco averted punishment by cooperating with law enforcement. In fact, there is no indication that the State's Attorney ever suspected that Safeco was complicit in Mutual Medical's alleged scheme to defraud its clients. Under the totality of the circumstances, the *Crowley* factors support the finding that the Safeco employees were not Walter's agents when conducting the audit of Mutual Medical.

This result appears to be in line with other Seventh Circuit cases addressing the same issue, albeit under slightly different factual circumstances. For example, in *United States v. Koenig*, 856 F.2d 843 (7th Cir.1988), the Seventh Circuit held that, even in light of the private parcel carrier's historical maintenance of good relations with law enforcement officials and employee's past cooperation with such officials, a security employee of the carrier was not acting as a de facto government agent when he opened a suspicious package and discovered cocaine. In that case, Judge Coffey held that mere cooperation was not enough to transform a private search into a governmental search, for a criminal defendant "must prove some exercise of government power over the private entity, such that the private entity may be said to have acted on behalf of the government rather than for its own private purposes." *Koenig*, 856 F.2d at 849. "Mere knowledge of another's independent action, does not produce vicarious responsibility absent some manifestation of consent and the ability to control." *Id.* at 850.

Although the facts in *Koenig* lack a specific request to assist law enforcement, that case is nonetheless instructive on the factor of control. There is no evidence in this record that Walter exhibited any level of control over the Safeco auditors. Although Walter acknowledged that he requested that the auditors review certain files during the audit, there is no indication that Safeco's decision to cooperate was anything but voluntary.

Similarly, in *Shahid*, the Seventh Circuit held that shopping mall security officers were not acting as instruments or agents of the government when they stopped and searched a man, who was suspected of shoplifting, because their primary role was to provide safety and security for all persons on mall property. There, Judge Cummings found that the fact that a private party "might also have intended to assist law enforcement does not transform him into a government agent so long as the private party had a legitimate independent motivation for engaging in the challenged conduct." *Shahid*, 117 F.3d at 326.

Unlike the case currently before the Court, in *Shahid* there was no request for the security guards to cooperate with law enforcement. This factual disparity is of no controlling consequence, however, because in a situation where the government knows of or acquiesces in a private party's conduct, the private party under those circumstances is typically induced to conduct a private search or seizure with the government's promise of a reward or the threat of a punishment. *Id.* at 327. In this case, Safeco's decision to conduct an audit was based neither on expectation of a reward, nor out of fear of punishment, but entirely upon its legitimate and independent interests.

Finally, in *United States v. Feffer*, 831 F.2d 734 (7th Cir.1987), the Seventh Circuit held that a taxpayer's employee acted voluntarily and without government inducement when, on several occasions, she delivered incriminating company documents to the Internal Revenue Service. Although there was no specific request for cooperation in *Feffer*, the Court found that the IRS agents, at a minimum, encouraged

the private party's participation, and, by bringing a microfilm copier to their meeting, there was no doubt that the agents expected her to produce the documents. There was also evidence that the woman was told about how she could become a numbered informant and the rewards for which she could apply. *Feffer*, 831 F.2d at 736. Even in light of this evidence, the Seventh Circuit affirmed the district court's finding that the informant's actions were purely voluntary and not the result of government inducement because the informant produced the documents to the government out of a fear of being held liable for her part in the tax fraud scheme being carried out by her employers.

If anything, the facts in *Feffer* more closely resemble the factual circumstances in the current case when compared with others addressing this Fourth Amendment issue. In contrast to the occasional encounter between private parties and law enforcement in other cases, like *Feffer*, Walter had a prolonged relationship with Safeco. Additionally, in *Feffer*, even though there was no actual request for documents, the actions of the IRS agents are loosely analogous to Walter's conduct when Walter specified what files should be reviewed. Finally, like the current case, the private party's actions in *Feffer* were purely voluntary and not the result of government inducement.

■ As the Seventh Circuit has reported, "a private citizen might decide to aid in the control and prevention of criminal activity out of his or her own moral conviction, concern for his or her employer's public image or profitability, or even desire to incarcerate criminals, but even if such private purpose should happen to coincide with the purposes of the government, this happy coincidence does not make a private actor an arm of the government." *Shahid*, 117 F.3d at 326. Because the Court finds, as a matter of law, that

the evidence does not support an agency relationship between Walter and any Safeco employee, there can be no violation of the Fourth Amendment, and, therefore, no basis for civil liability on this claim.

The Plaintiffs have also failed to present evidence demonstrating that Kemper was acting as Walter's agent when the Wolfe file was removed from Mutual Medical's office. There is no evidence in the record, either direct or circumstantial, that Walter either knew of or acquiesced in the removal of the Wolfe file. In fact, it is undisputed that Walter knew nothing about Kemper's possession of the file until after it was removed. And, when asked by Walter whether he had the legal right to take the file, Kemper assured Walter that he did. Accordingly, there is no basis for liability on the claim that the file was removed in violation of the Fourth Amendment.

## II. *False Arrest*

■ Count II of the Amended Complaint alleges that Jones was falsely arrested in violation of the Fourth Amendment because his arrest was not supported by probable cause. Jones argues that the grand jury indictment and resulting arrest warrant do not shield Walter from this claim because the record shows that he knowingly, intentionally, or with reckless disregard for the truth made the arrest without probable cause.

■ Count II must be dismissed. Although the Plaintiffs label this cause of action as one for "false arrest," it is actually a malicious prosecution claim. Because Illinois law allows a common law cause of action for malicious prosecution, a federal claim is prohibited. *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir.2001); *Gauger v. Hendle*, 349 F.3d 354, 359 (7th Cir.2003).

■ A claim for false arrest is a claim for the harm of being unlawfully imprisoned through some extrajudicial act that

does not amount to legal process, for example, when a police officer performs a warrantless arrest without probable cause. *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 900 (7th Cir. 2001). See, also, *Porterfield v. Lott*, 156 F.3d 563, 568 (4th Cir.1998); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 117–18 (2nd Cir.1995). A successful plaintiff can pursue damages only for the detention that occurred "up until issuance of process or arraignment, but not more." *Snodderly*, 239 F.3d at 900, citing, *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In contrast, malicious prosecution permits damages for "confinement imposed pursuant to legal process." *Id.*

In this case, Jones was indicted by the grand jury and an arrest warrant was issued by a judge. The issuance of a warrant is "legal process." *Gauger*, 349 F.3d at 361. Thus, the claim seeking damages for unlawful confinement imposed pursuant to a warrant sounds not in false arrest, but in malicious prosecution. *Snodderly*, 239 F.3d at 900.

■■■ When a state-law remedy exists for malicious prosecution, its existence knocks out any constitutional tort of malicious prosecution, because due process of law is afforded by the opportunity to pursue a claim in state court. *Newsome*, 256 F.3d at 751. Illinois allows an action at common law for the tort of malicious prosecution and the Plaintiffs have asserted such claims in Counts VI–VIII of the Amended Complaint. Accordingly, because the record is clear that the arrest of Jones occurred only after the warrant for his arrest was signed by a judge, his claim for false arrest must fail.

### III. *State Law Claims and Counter Claim*

■■■ Title 28 U.S.C. § 1367 provides that a district court "may decline to exercise supplemental jurisdiction" over pendent state-law claims if the court has dismissed all claims over which it has jurisdiction. *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1250 (7th Cir.1994), citing 28 U.S.C. § 1367(c)(3). A district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise jurisdiction over pendent state-law claims. *Id.* at 1251, citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir.1994). Finally, as a general rule, when all federal claims are dismissed, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits. *Wright*, 29 F.3d at 1250, citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### A. *Malicious Prosecution*

Counts VI–VIII of the Amended Complaint allege state law claims of malicious prosecution. Although the Court would normally preserve the Plaintiffs' state claims for review in state court, because all the issues were included in the summary judgment briefs after the close of discovery and they are capable of timely disposition, the Court will exercise its discretion to address them. See *Graf v. Elgin, Joliet & E. Ry. Co.*, 790 F.2d 1341, 1347–48 (7th Cir.1986).

■■■ Before engaging in an analysis of the malicious prosecution claim on the merits, it is first necessary to address the issue of whether Walter is entitled to absolute witness immunity for his grand jury testimony. If Walter is absolutely immune from claims arising out if his grand jury testimony, there can be no claim of malicious prosecution that survives, because Walter did not testify at trial, and the

record is silent as to any post-indictment involvement that could be considered significant.

The question of whether grand jury witnesses enjoy absolute immunity for their testimony is an open question in Illinois. Although the Seventh Circuit has extended the Supreme Court's decision in *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (which held that immunity protects those who testify at trial) to provide immunity from § 1983 for grand jury testimony, no Illinois case extends the privilege to grand jury testimony. See, *Kincaid v. Eberle*, 712 F.2d 1023 (7th Cir. 1983). In *Fabiano v. City of Palos Hills*, 336 Ill.App.3d 635, 271 Ill.Dec. 40, 784 N.E.2d 258 (1st Dist.2002), while not deciding the issue directly, the Illinois First District suggested, in dicta, that the absence of cross-examination and the non-adversarial nature of grand jury proceedings increase the risk that false testimony will go undetected and militate against an extension of the absolute privilege.

Absent any authoritative Illinois case to the contrary, the Court finds the Seventh Circuit's reasoning in *Kincaid* to be persuasive. As the Seventh Circuit highlighted in its short opinion, at common law, witnesses appearing before a grand jury were entitled to absolute immunity. See *Lake v. King*, 1 Wms.Saund. 131, 132, 85 Eng.Rep. 137, 139 (K.B.1679); *The King v. Skinner*, 1 Lofft 55, 56, 98 Eng.Rep. 529, 530 (K.B.1772); *Kidder v. Parkhurst*, 85 Mass. 393, 3 Allen 393, 396 (1862); *Schultz v. Strauss*, 127 Wis. 325, 328, 106 N.W. 1066, 1067 (1906). Legal history aside, the policy reasons for absolute grand jury immunity are also persuasive. A police officer who is threatened with a malicious prosecution claim every time he/she testifies in a grand jury proceeding will be "distracted from and impeded in the performance of his official duties." *Kincaid*, 712 F.2d at 1024. Further, the Court is

persuaded that the "argument for absolute immunity is stronger in the grand jury setting than in the trial setting, because false testimony before the grand jury is less harmful than false testimony at trial; the grand jury can indict, but cannot convict." *Id.* Finally, the risk that false grand jury testimony will go undetected, as articulated in *Fabiano*, is lessened to some extent as the case proceeds to trial because the Illinois discovery rules expose the grand jury proceeding to light by entitling the defense to a transcript of those portions of the proceeding that contain relevant testimony of persons who the prosecuting attorney intends to call as witnesses at trial. *See,* Illinois Supreme Court Rule 412.

Accordingly, Walter is absolutely immune from liability resulting from his testimony before the grand jury. Because the only significant role Walter played in the prosecution of Jones that is established in this record was his grand jury testimony, the allegations of malicious prosecution set out against him in Counts VI–VIII must be dismissed.

█ Even if Walter were not protected by absolute immunity, the malicious prosecution claim would fail on the merits. Under Illinois law, to state a cause of action for malicious prosecution, a plaintiff must allege facts showing:(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceedings; (4) the presence of malice; and (5) damages resulting to the plaintiff. *Ferguson v. City of Chicago*, 343 Ill.App.3d 60, 277 Ill.Dec. 316, 795 N.E.2d 984, 986 (2003).

The second and fifth elements are obviously met: the jury in the criminal case found in Jones' favor and, as a result of his arrest and prosecution, Jones suffered in-

jury. The remaining elements of the claim will be addressed in turn.

### 1. *Commencement of Criminal Proceeding*

■ The first element necessary to establish a cause of action for malicious prosecution is the commencement of a criminal proceeding by the defendant. In this case, there was a criminal proceeding initiated, but an issue exists as to whether it was commenced by Walter, who was not the prosecutor, but the investigator.

■ Liability for malicious criminal prosecution is not limited to prosecutors and police officers, but extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all the elements of the tort are present. *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill.App.3d 340, 248 Ill.Dec. 160, 733 N.E.2d 835, 842 (2000). Typically, a cause of action lies when the defendant made a false statement to or the willful concealment of facts from a prosecuting official which results in the recommendation of the issuance of a warrant. It may also exist where a defendant urges or insists that another institute a criminal proceeding. See, 54 C.J.S. *Malicious Prosecution* § 18 (2003).

The case before the Court is not the traditional "complaining witness" scenario where a citizen knowingly gives false information to a police officer, who then swears out a complaint. *See, e.g., Rodgers*, 315 Ill.App.3d 340, 248 Ill.Dec. 160, 733 N.E.2d 835. The problem with Plaintiffs' theory for this claim is that there is no allegation, much less evidence, that Walter ever misled or otherwise deceived the State's Attorney into commencing the criminal prosecution of Jones. Although Walter arguably withheld potentially exculpatory evidence from the grand jury, there is nothing to suggest that he con-

cealed any such information from the State's Attorney.

Moreover, it was the members of a County Board who asked the State's Attorney's office to open an investigation into Mutual Medical's dealings, and the State's Attorney, in turn, who assigned Walter to conduct the investigation. It was also the State's Attorney, with undisputed full disclosure of the information developed by Walter, who decided to present the case to the grand jury, request the indictment, and present the prosecution's case at trial.

The Plaintiffs' do not cite, nor is the Court aware of any case in which a malicious prosecution claim against the investigating officer has survived summary judgment when the record reflects that the investigator disclosed all the fruits of his investigation to the prosecutor. Although the Court believes that Walter, as the sole grand jury witness, obviously played a significant role in the prosecution of Jones up through the grand jury proceedings, the Court finds that Illinois law would not expose an investigator to liability on a malicious prosecution claim when there is no assertion or proof that he in any way misled, deceived, or otherwise concealed facts from a prosecutor who later instituted criminal proceedings and pursued those criminal charges at trial. It is important to remember that a malicious prosecution suit against a police officer is an anomaly in itself, since the principal player in carrying out a prosecution is not the police officer but the prosecutor. *Albright v. Oliver*, 510 U.S. 266, 279 n. 5, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). The fact that the prosecutor enjoys absolute immunity from suit should not, by itself, expose a police officer to greater liability in his place. There is little wonder why suits for malicious prosecution in Illinois are not favored. *Joiner v. Benton Community Bank*, 82 Ill.2d 40, 44 Ill.Dec. 260, 411

N.E.2d 229 (1980); *Schwartz v. Schwartz,* 366 Ill. 247, 8 N.E.2d 668 (1937); *Shedd v. Patterson,* 302 Ill. 355, 134 N.E. 705 (1922).

### 2. *Probable Cause*

■ The next element necessary to establish a malicious prosecution claim is that the criminal prosecution must have been initiated without probable cause. A dispute concerning some facts relevant to the determination of probable cause does not preclude a finding of probable cause, so long as the finding survives the adoption of the Plaintiffs' version of the disputed material facts. *Cervantes v. Jones,* 188 F.3d 805, 811(7th Cir.1999).

■ Probable cause has been defined in a malicious prosecution case involving criminal proceedings as "a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Rodgers* 248 Ill.Dec. 160, 733 N.E.2d at 842; see also, *Knox County v. Midland Coal Co.,* 265 Ill.App.3d 782, 203 Ill.Dec. 577, 640 N.E.2d 4 (1994); *Burghardt v. Remiyac,* 207 Ill.App.3d 402, 152 Ill.Dec. 367, 565 N.E.2d 1049 (1991). It is the state of mind of the one commencing the prosecution, and not the actual facts of the case or the guilt or innocence of the accused, which is at issue. *Id.*

■ "Prima facie probable cause" is established by return of indictment by grand jury, but it is not conclusive evidence of probable cause and it may be rebutted by other evidence such as proof that indictment was obtained by false or fraudulent testimony before grand jury or other improper or fraudulent means. *Freides v. Sani–Mode Mfg. Co.,* 33 Ill.2d 291, 211 N.E.2d 286 (1965).

■ The Court finds that the material evidence in the record, which is not in dispute, supports a finding of probable cause. Although he purports to do so, Jones has completely failed to rebut or otherwise negate probable cause in this case.

First, the inherent conflict of interest frames the entire factual analysis. Jones' dual role as administrator and broker provided him with both the opportunity and the motive to generate personal income at the expense of his clients. In fact, it was this relationship, which was not fully disclosed in a timely manner, that prompted the Peoria County Board to request an investigation in the first place.

Additionally, it is undisputed that in each of the three alleged incidents of fraud that Walter presented to the grand jury, as detailed above, the claims were not paid by Mutual Medical within the policy years that the services were billed and, as a result, PMP, Peoria County, and Pike County were not reimbursed by Safeco to the extent they would have been if the medical charges had been paid in the premium year in which they were incurred. As a result, these three clients of Mutual Medical arguably lost a collective total $104,829.

With regard to the Wilson case, Jones claims that the Wilson's hospital bill for the services performed in the days leading up to July 12, 1998, was not received until February of 1999. Indeed, it was Jones' defense at trial that he did not receive the bill until February of 1999. This defense was maintained (successfully as it turned out), even though the hospital's internal billing records indicate that a bill was sent to Mutual Medical by certified mail and that a Mutual Medical employee signed for it on July 16, 1998. Walter and the State's Attorney were aware at the time of the grand jury proceedings that it was the position of Jones and Mutual Medical that the hospital bill had not been received until 1999, but they were not required to actual-

ly accept this explanation. And, if he doubted the truth of this explanation, Walter was under no legal obligation to disclose this defense or any other exculpatory evidence to the grand jury. *United States v. Williams,* 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (Finding that district court may not dismiss otherwise valid indictment on ground that government failed to disclose to grand jury "substantial exculpatory evidence" in its possession). This applies in the civil context as well. *See, e.g., Camiolo v. State Farm Fire and Casualty, Co.,* 334 F.3d 345, 362–63 (3rd Cir.2003); see, also, *Carson v. Lewis,* 35 F.Supp.2d 250, 260 (E.D.N.Y.1999). In any event, this argument does nothing to negate probable cause in this case, particularly in light of strong evidence in the record that the second interim bill was actually received at Mutual Medical's offices.

Regarding the Wolfe case, Jones argues that the prosecution lacked probable cause because the failure to make timely payments was not an act of fraud, but was attributable to the period of time it took to challenge certain bills as excessive in one case and receive an itemized bill in the other. Again, simply because an explanation exists, does not mean that it has to be accepted. The Plaintiffs have made no meaningful attempt to explain why no notice was given to PMP that its employee's medical bills were not being paid in a timely manner or why another $40,000 would be necessary to cover an additional set of deductibles for the Wolfe twins. Nor have the Plaintiffs addressed the fact that Mutual Medical, contrary both to their agreement with Safeco and standard operating procedure, wrote a check for Mutual Medical's account to cover $154,000 in medical bills for the twins, but never submitted the claim to Safeco for reimbursement.

In the Pike County case, Mutual Medical knew in late November of 1999 that Pike County's policy year would end on January 31st, but was seemingly indifferent to that important date when it returned Janet Boren's hospital bill for itemization of medical services without a request that it be forwarded back as soon as possible.

Finally, prima facie probable cause is not rebutted by the claim that Jones had no reason to engage in criminal activity because he could have legally made more money by simply raising the premiums he charged to his clients. The occasion to collect more profit is substantially irrelevant as to whether probable cause existed. This response to the criminal charges may have created reasonable doubt in the minds of the jurors, but it has little effect on the determination of whether probable cause supported the arrest.

### 3. *Malice*

Malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice. *Mack v. First Security Bank,* 158 Ill.App.3d 497, 110 Ill.Dec. 537, 511 N.E.2d 714 (1987). Malice, as an element of malicious prosecution, is proved by showing that the prosecutor was actuated by improper motives. *Id.* Although the Court does not believe that the Plaintiffs have produced any evidence of malice, this issue, if in dispute, would ordinarily be one of fact left to the determination of the jury and is, therefore, not capable of resolution on a Motion for Summary Judgment.

### B. *Breach of Contract Counter–Claim*

Count I of Peoria County's Amended Counter–Claim asserts a cause of action for breach of contract. Neither side has moved for summary judgment on this issue. After weighing the relevant factors of judicial economy, convenience, fairness,

and comity, the Court declines to exercise supplemental jurisdiction over Defendant's state law claim. Accordingly, the Court will dismiss the Amended Counter–Claim without prejudice to it being re-filed in state court.

### Conclusion

For the foregoing reasons, the Defendant's Motion for Summary Judgment [# 86] is GRANTED. Because the Court declines to retain jurisdiction over the state law counter-claim, it is DISMISSED without prejudice so that it may be re-filed in state court. This case is now terminated.